```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON

_____x
                              :
UNITED STATES OF AMERICA,      :           Criminal Action
                              :
              Plaintiff,       :           Nos.  2:14-cr-00264
                              :                  2:14-cr-00275
v.                             :                  2:14-cr-00276
                              :                  2:14-cr-00277
DENNIS P. FARRELL,            :
WILLIAM E. TIS,               :
CHARLES E. HERZING,           :           Date:  January 27, 2016
GARY L. SOUTHERN,             :
FREEDOM INDUSTRIES, INC.,     :
MICHAEL E. BURDETTE and       :
ROBERT J. REYNOLDS,           :
                              :
                              :
              Defendants.  :
_____x
```

```
                     TRANSCRIPT OF HEARING
         REGARDING FACTUAL AND LEGAL BASIS FOR PLED OFFENSES
           BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
                  UNITED STATES DISTRICT COURT
                   IN CHARLESTON, WEST VIRGINIA
```

APPEARANCES:

```
For the Government:        AUSA PHILIP H. WRIGHT
                           AUSA LARRY R. ELLIS
                           AUSA ERIC P. BACAJ
                           U. S. ATTORNEY'S OFFICE
                           P. O. Box 1713
                           Charleston, WV 25326-1713


For the Defendants:        MARK C. MOORE, ESQ.
                           Nexsen Pruet
                           7th Floor
                           1230 Main Street
                           Columbia, SC 29201
                           (Counsel for Gary Southern)
```

(Appearances Continued.)

                          ROBERT B. ALLEN, ESQ.
                          PAMELA C. DEEM, ESQ.
                          Kay Casto & Chaney
                          P. O. Box 2031
                          Charleston, WV 25327-2031
                          (Counsel for Gary Southern)

                          MICHAEL W. CAREY, ESQ.
                          S. BENJAMIN BRYANT, ESQ.
                          Carey Scott Douglas & Kessler
                          P. O. Box 913
                          Charleston, WV 25323
                          (Counsel for Dennis Farrell)


                          SUSAN M. ROBINSON, ESQ.
                          Thomas Combs & Spann
                          P. O. Box 3824
                          Charleston, WV 25338-3824
                          (Counsel for Michael Burdette)

                          ROBERT R. LEIGHT, ESQ.
                          Pietragallo Gordon Alfano Bosick &
                          Raspanti
                          One Oxford Centre, 38th Floor
                          301 Grant Street
                          Pittsburgh, PA 15219
                          (Counsel for Freedom Industries, Inc.)

                          KATHLEEN A. GALLAGHER, ESQ.
                          MARK C. LEVY, ESQ.
                          Eckert Seamans Cherin & Mellott
                          44th Floor
                          600 Grant Street
                          Pittsburgh, PA 15219
                          (Counsel for William Tis)

                           JOHN A. CARR, ESQ.
                           Suite 209
                           179 Summers Street
                           Charleston, WV 25301
                           (Counsel for William Tis)

                           STEPHEN G. JORY, ESQ.
                           McNeer Highland McMunn & Varner
                           P. O. Box 1909
                           Elkins, WV 26241-1909
                           (Counsel for Charles Herzing)

(Appearances Continued.)

                              R. BRANDON JOHNSON, ESQ.
                              PAUL M. STROEBEL, ESQ.
                              Stroebel & Johnson
                              P. O. Box 1668
                              Lewisburg, WV 24901
                              (Counsel for Robert Reynolds)


Probation Officers:        Jeffrey Gwinn
                           Matthew Lambert


Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1        PROCEEDINGS had before The Honorable Thomas E. Johnston,

2   Judge, United States District Court, Southern District of West

3   Virginia, in Charleston, West Virginia, on January 27, 2016, at

4   9:40 a.m., as follows:

5        COURTROOM DEPUTY CLERK:  The matters before the Court

6   are the United States versus Dennis Farrell, William Tis, Charles

7   Herzing and Gary Southern, criminal action number 2:14-cr-00264,

8   United States v. Freedom Industries, criminal action number

9   2:14-cr-00275, United States v. Michael Burdette, criminal action

10  number 2:14-cr-00276, and the United States v. Robert Reynolds,

11  criminal action number 2:14-cr-00277, all scheduled for a hearing

12  on the factual basis and legal basis for pled offenses.

13       THE COURT:  All right.  Good morning.  I'm going to ask

14  you to note your appearances now.  That, I can tell, is going to

15  take a moment, and I would ask that you identify everybody that's

16  with you, including the defendants.  We have a lot of people here

17  and nobody is in any orange jumpsuits or anything.  So, in order

18  to be able to identify everyone in the courtroom, I'd like you to

19  -- I'd like whoever is going to speak on behalf of each defendant

20  to -- or each party to identify everyone that's with them.

21       MR. WRIGHT:  Your Honor, Philip Wright, Larry Ellis and

22  Eric Bacaj on behalf of the United States.

23       MR. MOORE:  Good morning, Your Honor.  Mark Moore, Bob

24  Allen, and Pam Deem on behalf of Gary Southern.

25       MR. CAREY:  Good morning, Your Honor.  Denny Farrell,

1    the defendant, here in person with me and, of course, Ben Bryant.

2            MS. ROBINSON:  Good morning, Your Honor.  Susan

3    Robinson on behalf of Michael Burdette, who is present here in

4    court.

5            MR. LEIGHT:  Your Honor, Robert Leight on behalf of

6    Freedom Industries.  With me is Mr. Robert Johns, the spill claim

7    administrator.

8            MS. GALLAGHER:  Your Honor, Kathleen Gallagher on

9    behalf of William Tis.  With me, John Carr and Mark Levy, along

10   with Mr. Tis.

11           MR. JORY:  Steve Jory on behalf of Charles Herzing, who

12   is present in person.

13           MR. JOHNSON:  Brandon Johnson on behalf of Robert

14   Reynolds, and Paul Stroebel is also with me today, Your Honor.

15           THE COURT:  All right.  Very well.  Well, I hope I

16   haven't caused too much concern by setting this hearing today.

17   So, let me explain why I did, and this will take a moment.

18       As has been noted, and I think I noted at some of the plea

19   hearings, I take the finding of a factual basis in a case very

20   seriously and there are three reasons for that.

21       First of all, it's required by Rule 11, which is the Rule of

22   Criminal Procedure that governs the taking of a guilty plea.  It

23   requires me to find that there's a factual basis.  The Government

24   has, I think, adequately set forth the standard for that in their

25   briefing.  I have previously set forth the standard for that, as

1    well, in a case that I'll get to in a moment.

2         Secondly, I have no interest in sentencing somebody who I

3    don't believe is guilty of a crime.  That sounds sort of

4    elementary, but it is an important part of my job and maybe the

5    most important reason that I take this so seriously and, as I've

6    indicated in the past, and this is not necessarily a comment on

7    the defendants here today, but I understand that people who

8    appear in front of me are not always pure as the wind-driven

9    snow, but that doesn't mean -- but that's not the question.  The

10   question in front of me in an individual case is are they, in

11   fact, guilty of the crime to which they've pled guilty in the

12   case of a guilty plea.

13        Third, I've had some problems with factual bases over the

14   years.  Probably some of the people in this room are familiar

15   with the case I'm referring to.  I'm tired of mentioning it by

16   name, but about six years ago, I had a case with many defendants

17   in it and had taken a handful of pleas; and then, I took a plea

18   where I realized that, on the face of the stipulation, one of the

19   elements of the crime was actually negated instead of being

20   supported, and then I thought to myself, oh, could this have

21   happened in some of the other pleas in this case, and it turned

22   out I ended up throwing out a handful of the pleas in that case

23   for lack of a factual basis.

24        That was an eye-opening experience for me and, since then,

25   I've paid very close attention to the factual basis in every case

1    I've handled.  Some cases, that's not a hard question.  Often, in

2    drug cases, it's an extremely easy question, but in other cases,

3    particularly those that are -- that are based on a more

4    complicated legal foundation, it's something I pay very close

5    attention to, and I question every aspect of the case when I do

6    that.  So -- and that experience was many years ago now.  Many

7    years ago.  I probably can't use the word "many" for years yet in

8    my job.  I probably haven't been in it that long, but that was

9    about six years ago.

10        One might argue that that was six years ago and you can

11   relax a little bit about this but, last fall, I threw out two

12   more cases, and here's what happened in both cases:  They got

13   down to a day before sentencing and I spotted something I thought

14   might be an issue.  I asked the parties to look at it, and the

15   parties in both cases came back to me in agreement that, in one

16   case, there was no factual basis for the charge and, in the other

17   case, there was no legal basis for the charge.  So, I don't feel

18   like I can relax about this.  I'm constantly vigilant when it

19   comes to factual basis issues.  Both those cases, I personally

20   was the one who found the issue.  So, that's why I'm so concerned

21   with factual basis issues.

22        Now, why are we having this hearing in this case?  Well, as

23   you can imagine, this is a fairly complicated area of the law and

24   there are two basic reasons I wanted to have this hearing in this

25   case.  First of all, the law is complicated.  I haven't had very

1    many environmental cases, so I don't have a -- I do not have a

2    particularly full background in environmental law, and I think it

3    is important for me to educate myself on these cases before I'm

4    going to be prepared to sentence them, and that means educating

5    myself based on the law and the facts.

6         Now, the Government has filed some good briefing and I've

7    done a lot of my own analysis, but I still have quite a number of

8    questions.  Now, that doesn't mean that I'm not -- that I -- I

9    wouldn't say that it means that I necessarily am concerned about

10   the factual basis.  I just feel like I need to be educated.  And

11   I thought a lot about this and I came to the conclusion that the

12   -- that the best, most practical, and most appropriate way to do

13   that is to get everybody together to do that so that I can ask

14   some questions and learn more about the case, and circumstances

15   of the case, both the law and the facts.

16        The other thing, this wasn't mentioned specifically in the

17   order, but I thought it would be appropriate, also, I have some

18   questions that don't necessarily go to the legal or factual basis

19   for the pleas, but would be helpful for my understanding of the

20   case for purposes of sentencing, and I decided rather than do --

21   ask those kinds of questions on a piecemeal basis in individual

22   hearings, it would be better, and probably more efficient, to get

23   everybody together and address those questions all at once so

24   that I really, more than -- in this case, more than any I've ever

25   had where I've had multiple defendants, everything is so closely

1    related and so closely tied together, that it has been very

2    important to me from the beginning to be able to view this case,

3    take a step back and view this case as a whole.

4         And, while I have to sentence individual defendants based on

5    the individual circumstances of their cases, I think it's

6    important in this case for me to have the big picture and that's

7    the reason -- that's the reason I wanted to get together today.

8    So, I hope that, to some extent, that puts you a little bit at

9    ease that I'm not necessarily saying that the factual or legal

10   basis is at jeopardy here.  I just want to get some more

11   education and -- and be better educated on the cases.

12        I have a series of questions I'm going to ask, and probably

13   most of these are first going to be directed at the Government,

14   and then I will give the defendants an opportunity to chime in.

15   What I've noted is, for the most part, you all have been on the

16   same page with the Government, so -- and it is the Government's

17   case, and they're probably in a -- in the best position to answer

18   some of the questions that I have.

19        We will get into a number of issues here.  I think I'm going

20   to start out probably with some factual issues that might

21   actually go -- or factual questions, I don't want to say issues,

22   but factual questions, some of which might actually go more to

23   sentencing.

24        So, Mr. Wright, I'm going to start out.  Are you going to

25   speak for the Government?

1          MR. WRIGHT:  Yes, Your Honor.

2          THE COURT:  All right.  Very well.  Let me start out

3     and, in all honesty, there's probably no particular order to

4     these things.  Some of them are related, and so I'm saving those

5     for later, so there's not necessarily going to be any particular

6     order to this, but let's start out with this.

7        In Mr. Reynolds' case, there's no reference to the

8     groundwater plan.  There's only a reference in the stipulation to

9     stormwater.  Is there a particular reason for that because, from

10    what I've seen in all the other cases, there's a reference to

11    both, I believe, but in Mr. Reynolds' case, it's only storm

12    water.  Is there any particular reason for that?

13         MR. WRIGHT:  No, Your Honor.  And I think what I would

14    start out by saying is, Mr. Reynolds was the first one to come

15    in, and you may have noticed that either the charge/charges have

16    kind of changed a little bit, and I think it's either we got more

17    information, or I got a little smarter.  So, no, there's no

18    particular reason.  And I do believe that would be a factor if a

19    charge against Mr. Reynolds on Count One had gone forward on a

20    particular count to which he pled guilty.  That would have been

21    part of the evidence, but at that particular time and the way I

22    wrote it, no excuse.

23         THE COURT:  I actually figured that was probably the

24    answer, that he was the first one in and that this process

25    evolved, but I just -- there's more mention in the documents, the

1    various documents that I've read, and I've read a lot of them, at

2    this point.  There's more mention of stormwater than groundwater,

3    although they're both in the permit.  So, my question is, the

4    corollary question to that is, I just wanted to make sure there's

5    no question and, by the way, if the defendants have any -- let's

6    see if we can have an agreement on this.  Does anybody object

7    that I will rely upon factual representations made by the

8    Government unless somebody objects to that factual

9    representation?  Does anybody object to doing that?

10        All right.  Now, so the question that raised for me is, was

11   there, in fact, no groundwater plan?

12            MR. WRIGHT:  That's correct.

13            THE COURT:  Okay.  Now, I know that there was

14   uncovered, at some point, a draft stormwater plan that was never

15   signed or implemented.  Was there even a draft groundwater plan

16   or there was just none at all?

17            MR. WRIGHT:  Your Honor, we obtained records from a

18   company called CTL Engineering and my memory is that they had

19   something in their files that said "groundwater protection plan."

20   There was nothing in the files at Freedom that say "groundwater

21   protection plan" and I think -- I would have to go back and check

22   specifically, but CTL Engineering's plan, I think, said "draft."

23   We have no record that they ever transmitted it to Freedom.

24            MR. CAREY:  I might be able to provide a little bit

25   more information because I studied those records pretty closely,

1   Your Honor.  Upon the purchase of Etowah, Mr. Farrell asked

2   through his law firm to have those plans prepared.  CTL

3   Contracting -- or Engineering -- was contracted to do that.  A

4   guy named Bill Chambers sent a memo to another employee of CTL

5   who, I believe, was stationed in Morgantown asking him to draft

6   both these GPPs, the groundwater plan, and the stormwater plan as

7   soon as possible.

8        Apparently, the first document he prepared was the

9   groundwater protection plan and, Phil's right, it's marked

10  "draft."  However, there's no indication that that plan was ever

11  transmitted to Freedom, and I spoke to the president of CTL and

12  he confirmed for me that he looked for any transmittal documents

13  and could find none for the draft GPP.

14        Thereafter, a draft stormwater plan was prepared and,

15  apparently, that was, it appears, hand-delivered to Mr.

16  Hutchinson at Etowah, who apparently made some handwritten

17  notations on the plan, the stormwater plan, returned that back to

18  Bill Chambers, and in the files of CTL, the changes that had been

19  handwritten on were made in another document, I mean, and

20  basically finalized.  It's dated, I think, some two weeks later

21  after the draft is dated.  However, there's no indication that

22  that final was ever transmitted to Freedom.

23        Again, speaking to the president, he said he looked for it,

24  but couldn't find it.  There was a draft letter on the computer,

25  but it's unsigned, transmitting the final.  It wasn't done.

```
 1              THE COURT:  And does this all go back to roughly 200
 2     and --
 3              MR. CAREY:  2.
 4              THE COURT:  2?
 5              MR. CAREY:  Yes, sir.
 6              THE COURT:  All right.  All right.  Okay, were there
 7     any other permits at all other than the one -- I have a copy here
 8     of the one that we've heard so much discussion and briefing
 9     about.  Were there any other permits at all,
10     environmental-related permits at --  is it pronounced Etowah?
11     Etowah?
12              MR. CAREY:  Etowah.
13              MR. WRIGHT:  Etowah.
14              THE COURT:  For the Etowah facility?
15              MR. WRIGHT:  Not concerning the water, Your Honor, and
16     I have to check.  I don't know if there was an air permit or
17     something associated with the Clean Air Act, but for our
18     purposes, no, there was no other permit.
19              THE COURT:  Okay.  All right.  Just to clarify that
20     question, there were no other Clean Water Act permits?
21              MR. WRIGHT:  That's correct, Your Honor.
22              THE COURT:  Okay.  All right.  All right.  Let's talk
23     about MCHM.  I have not seen a material safety data sheet on it,
24     but I understand that that existed and, from what I've seen in
25     the briefing in terms of hazards, what those sheets listed was
```

1    short-term skin and eye irritation.  Do we have any information,

2    and I understand this may be the subject of litigation, as we

3    speak, but do we have any information that indicates what the

4    long-term effect of exposure to MCHM might be?  First of all, was

5    that on any of the material data -- material safety data sheets?

6              MR. WRIGHT:  I don't believe so, Your Honor.  There

7    were two material safety data sheets that we were concerned with.

8    One was issued by Eastman, I think, dated August of 2011, and

9    there was one that Freedom itself actually prepared under its own

10   particular brand name after they had mixed it with a substance

11   called PPH.  So, that was the safety data sheet that I think is

12   referenced in the documents concerning Freedom's stipulation or

13   in Freedom's stipulation.

14       I'm not aware of other documents that talk about the

15   long-term health consequences of MCHM.  Now, there may be

16   documents -- we have -- we have records from Eastman Chemicals.

17   There are a lot of records, and I've personally not gone through

18   all of them, so I don't know what's in them about the long-term

19   health consequences of the exposure to MCHM.

20             THE COURT:  Well, that raises another question.  I've

21   seen the information that indicates that part of the process that

22   was being undertaken at the Etowah facility was the mixing of

23   MCHM with a chemical called PPH; is that correct?

24             MR. WRIGHT:  Yes, Your Honor.

25             THE COURT:  But what was in Tank 396 was just MCHM; is

1      that correct?

2              MR. WRIGHT:  Your Honor, I believe it was the product

3      that they marketed, which would be the MCHM with PPH.

4              THE COURT:  So, what actually leaked was the mixture?

5              MR. WRIGHT:  Yes, Your Honor, and for purposes of just

6      discussion, we've always just referred to that mixture as "MCHM".

7              THE COURT:  I understand.  Do we -- do we have any

8      additional knowledge of PPH and what its health effects due to

9      exposure might be?  Are those -- for example -- well, maybe you

10     answered my question already.  Is Freedom's MSDS related to the

11     mixture?

12             MR. WRIGHT:  Yes, Your Honor, and I don't think that

13     document discusses the long-term effects of either MCHM as

14     purchased from Eastman, or PPH standing alone, or the two of them

15     together.

16             THE COURT:  Do we have any information on PPH?

17             MR. WRIGHT:  There were letters that were sent to the

18     DEP to explain that they had mixed that substance, PPH, with the

19     MCHM.  I don't think that letter says anything other than this is

20     the chemical makeup of that substance and it was mixed.  I don't

21     think there's anything in those records, quite frankly, Your

22     Honor.  I don't know for sure, but I don't think so.  I don't

23     think there are records that would say what the long-term effect

24     is of PPH in our possession.  There may be, but there are a lot

25     of records.

```
 1                    THE COURT:  Was the PPH purchased by Freedom as a raw
 2       material from some other company?
 3                    MR. WRIGHT:  Yes, Your Honor.  I don't know who
 4       purchased it, and maybe the defense would know better than me on
 5       that one.
 6                    MR. JOHNSON:  Your Honor, my client believes, Mr.
 7       Reynolds, that it was purchased from Dow, and that they did the
 8       material safety data sheets and it was the mixture which was what
 9       the data sheets reflected.  Nothing else in particular with PPH.
10                    THE COURT:  Have I ever been provided with a copy of
11       Freedom's MSDS on the mixture?
12                    MR. WRIGHT:  I can't think of where we have submitted
13       that, Your Honor.  I can provide it to you.
14                    THE COURT:  I would like to see that.
15           May we agree that to the -- and you don't have to provide it
16       to me right now, but as soon as practical after the hearing, and
17       we'll make it an exhibit for this hearing, is there any objection
18       to -- well, let me go back to my earlier -- anybody who makes a
19       factual statement, may I consider that for all cases unless
20       there's an objection?  And any exhibit I enter today, may I
21       consider that for all cases unless there's an objection?  All
22       right.
23           All right.  And this is clearly a -- not a factual basis
24       issue, but an inquiry I have for purposes of sentencing, and I'll
25       start -- the defendants may want to chime in on this, but I'll
```

1    start with the Government.  How often was each of these

2    defendants actually on-site at the Etowah facility before January

3    of 2014?

4           MR. WRIGHT:  If I can run through them, Mr. Reynolds

5    worked out of his home in North Carolina.  He would come up

6    periodically to the site either to perform work, but he would

7    also work from home, so he wasn't there all the time.  How often,

8    I'm not sure, Your Honor.  I think he could --

9           MR. REYNOLDS:  Maybe one day a month.

10          MR. WRIGHT:  I don't know if you heard that, Your

11   Honor.

12          THE COURT:  I did.

13      Mr. Reynolds -- for the record, Mr. Reynolds, himself, said,

14   "Maybe one day a month."

15          MR. WRIGHT:  Mr. Burdette was the on-site manager for

16   the facility, so his on-site place was the facility.  So, unless

17   he had reason to go somewhere else, he was there.  Mr. Tis and

18   Mr. Herzing were officers and directors of the company, but they

19   lived in Pennsylvania, and they would come down periodically.  I

20   don't know that we have a record of how often and what particular

21   days, but they would be there probably once a quarter, at the

22   very least, but they remained in contact with what was going on

23   through e-mail and including receiving copies of minutes of staff

24   meetings that were held generally on a weekly basis unless

25   something happened they didn't all meet.

1    Mr. Farrell worked on-site at the Etowah facility.  So,

2    unless he was traveling, then he was there.  Mr. Southern,

3    there's been some contention, but he wasn't there all the time.

4    I think he was there less than fifty percent of his working time

5    at the site.

6         THE COURT:  All right.  I've had a thought that Mr.

7    Reynolds said something a moment ago and I think the safest thing

8    for me to do is, if I'm going to -- and I should have anticipated

9    this, if the individual defendants are going to make a statement,

10   I think what I would like to do is place them under oath.  So, is

11   there any objection to doing that as a group?

12        MR. CAREY:  No, Your Honor.

13        THE COURT:  All right.  Then, I'll have each defendant

14   stand, and I will ask my courtroom deputy to administer an oath

15   to each.

16        COURTROOM DEPUTY CLERK:  Please raise your right hands.

17                       **ALL DEFENDANTS SWORN**

18        COURTROOM DEPUTY CLERK:  Thank you.

19        THE COURT:  All right.  You may be seated.

20    And, just for the record then, Mr. Reynolds, you said

21   earlier that you were on-site about once a month?

22        MR. REYNOLDS:  At the Etowah facility.

23        THE COURT:  At the Etowah facility.  All right.  Thank

24   you.

25    All right.  So, Mr. Carey, you wanted to chime in on that

1    one?

2            MR. CAREY:  Yes, Your Honor.  He said that he was there

3    -- he worked at the Etowah site.  It's true he had an office

4    there but, quite frankly, he was there almost every week, Your

5    Honor, but there were many days when he was traveling, because a

6    big portion of his responsibilities involved sales, and so he

7    would travel a bit, too.

8            THE COURT:  That was Mr. Farrell?

9            MR. CAREY:  Yes, Your Honor, I'm sorry.

10           MR. MOORE:  Your Honor, with respect to Mr. Southern,

11   we provided the Government and the Probation Office with his

12   calendar which shows the number of days a month he was there.  He

13   was on-site at the Etowah facility between five and seven days a

14   month on average, and I can give you a breakdown of exactly how

15   many days he was on-site each month.

16           THE COURT:  I don't think that's necessary.  I was just

17   trying to get a sense of how often the -- reading the materials,

18   I had a sense that -- well, until I -- I've only gotten two

19   Presentence Reports so far, I believe, and I think the second one

20   was on Freedom, which is -- that's a little different than the

21   individual defendants.  I think the only individual defendant's

22   Presentence Report I've seen so far is Mr. Reynolds, which I read

23   last night.  Well, I -- oh, we just got Mr. Burdette's, but I

24   haven't had a chance to look at it yet, but until I read that

25   Presentence Report, I was assuming that Mr. Reynolds or Mr.

1     Burdette were probably there on a daily basis and that the others

2     might not have been, but I've now learned Mr. Reynolds wasn't

3     there on a daily basis either.  So, that's the reason I asked the

4     question, was to clarify the point.  I don't need exact dates.

5                 MR. MOORE:  Yes, sir.

6                 THE COURT:  Anybody else have anything to add with

7     regard to what the Government said?

8                 MS. ROBINSON:  I would just clarify that Mr. Burdette

9     spent most of his time at the Etowah facility, but would be doing

10    projects at the Poca Blending Facility.  So, he was eighty

11    percent of the time probably at Etowah.

12                THE COURT:  Okay.  All right.  Well, that -- that

13    brings me to another question I have, and that is the structure

14    of Freedom.  We have the Etowah facility, which is actually --

15    let me see if I've got this right, Mr. Wright, and we'll start

16    with you, and then you can correct me, or anybody else can

17    correct me.

18       We've got Freedom as the parent corporation at least until

19    the sale in December of 2013.  That's the period of time up until

20    the point of that sale.  Freedom is the parent corporation.  ERT

21    is an LLC that is wholly owned by Freedom or members of Freedom's

22    board?

23                MR. WRIGHT:  Members of Freedom's board.  Specifically,

24    Mr. Farrell, Mr. Tis, and Mr. Herzing are the members of the LLC

25    which, at one point, was just a partnership and not an LLC.

```
 1              THE COURT:  Okay.  Now, there's also -- they have

 2     another facility called -- at least one other facility called

 3     Poca Blending, right?

 4              MR. WRIGHT:  That's correct, Your Honor.

 5              THE COURT:  And is that a similar facility to the

 6     Etowah facility?

 7              MR. WRIGHT:  In terms of, like, they had chemicals

 8     stored there, yes, Your Honor, and they also had a laboratory,

 9     and I think they did a lot of mixing at Poca Blending.  Poca

10     Blending, I believe, was wholly owned by Freedom, the

11     corporation.

12              THE COURT:  So, Poca Blending was a corporation that

13     was wholly owned by Freedom?

14              MR. WRIGHT:  Or I think it was an LLC holding by

15     Freedom.

16              THE COURT:  Was there any other facility or other

17     subsidiaries?

18              MR. WRIGHT:  I think there was a subsidiary called

19     Crete Technologies, LLC.  Your Honor, I'm not familiar enough

20     with that company, and I don't think it really played a role in

21     our case to know if it had a separate office, or where it was

22     located, or what it did.

23              THE COURT:  Okay.  Next question on that, Freedom is in

24     bankruptcy, as we speak.  That was originally filed as a Chapter

25     11.  Has it been converted to a Chapter 7?
```

```
1              MR. LEIGHT:  Your Honor, my understanding, in October
2    --
3              THE COURT:  You might want to identify yourself.
4              MR. LEIGHT:  I'm sorry.  Robert Leight on behalf of
5    Freedom.
6              THE COURT:  Yes, sir.
7              MR. LEIGHT:  My understanding is that the liquidation
8    plan was approved for the 11 in October of 2015, but I don't
9    believe --
10             THE COURT:  So it's an 11, but it's a liquidation?
11             MR. LEIGHT:  Yes.
12             THE COURT:  And are there -- are there claims that are
13   part of that liquidation that would be people affected by this
14   leak and the water problems associated with it?
15             MR. LEIGHT:  All the claims, to my understanding, are
16   going through the bankruptcy action and Mr. Johns has been
17   appointed as the spill claims administrator to handle those
18   claims.
19             THE COURT:  All right.  And so, there's a -- maybe this
20   is a better question for Mr. Johns then, actually.
21        Mr. Johns, my understanding is there was a deadline for the
22   filing of such claims sometime ago; is that correct?
23             MR. JOHNS:  That's correct, Your Honor.
24             THE COURT:  And so, those claims -- whoever is going to
25   make a claim in that case has made a claim, and that's being --
```

```
1    that's a part of what you're doing now, to work through those

2    claims?

3              MR. JOHNS:  That's correct, Your Honor.

4              THE COURT:  Based on where things stand right now, are

5    those claims going to consume all of the assets of Freedom?

6              MR. JOHNS:  Absolutely, Your Honor.

7              THE COURT:  Will the assets of Freedom be inadequate to

8    satisfy those claims?

9              MR. JOHNS:  Yes, Your Honor.

10             THE COURT:  Okay.  Have you had occasion or have you

11   been required to file any reports with the Bankruptcy Court or

12   other -- the Trustees Office or whoever associated with the

13   bankruptcy proceeding that would reflect that state of the

14   affairs?

15             MR. JOHNS:  No, Your Honor.  I believe the plan

16   probably would lay that out, that there's not enough -- there

17   would not be enough funds to pay all the claims in full.

18             THE COURT:  Okay, thank you.

19             MR. LEIGHT:  Your Honor, if I may, the Presentence

20   Report on Freedom indicates, I believe, that currently, there are

21   liabilities of $12 million with assets of $2.

22             THE COURT:  Well, I didn't really intend to get into

23   this today, but I just wanted to give the Government just a

24   preview of the Freedom sentencing, and my question when we get to

25   that is going to be what exactly am I doing in a Freedom
```

```
 1    sentencing if the -- well, I've been wondering that from the
 2    beginning, what exactly I'm going to accomplish in a Freedom
 3    sentencing, so that will be the first order of business at that
 4    sentencing, but I don't think we need to deal with that
 5    specifically today.
 6        All right.  This dovetails into another area of inquiry I
 7    have.  I've asked these questions about the corporate structure
 8    because I've been curious about them, but one of the few things I
 9    think I fairly well understand, because I've read the cases, is
10    the Responsible Corporate Officer Doctrine and, in particular, it
11    seems to have its origin in the Supreme Court's *Park* case.  There
12    are not a lot of cases on it, but -- and then there's the Fourth
13    Circuit case, I believe it's called *Ming Hong*, that talks about
14    it in the case of a -- an individual in Richmond, Virginia.
15        Ultimately, this is going to get -- this is just going to
16    get into a little bit of law here for a moment.  Ultimately, the
17    corporate structure of Freedom and its relationship with Etowah
18    under *Park* and *Ming Hong* really don't matter because under the
19    Responsible Corporate Officer Doctrine, any person who has the
20    authority and responsibility to do whatever it is that wasn't
21    done, or not do whatever it is that was done, forms the basis of
22    liability is potentially liable, regardless of their title and
23    regardless of what position they occupy in the corporate
24    structure; is that a fair statement?
25            MR. WRIGHT:  I agree with that, Your Honor.
```

1          THE COURT:  And that clearly flows from the *Ming Hong*

2     case?

3          MR. WRIGHT:  And the other cases, the *Park* case and

4     *Dotterweich*, D-o-t-t-e-r-w-e-i-c-h, I believe.

5          THE COURT:  Okay.  Now, that brings me to another legal

6     issue, and that is the -- Count Two of the indictment, and I know

7     that -- well, I think all -- everybody that's pled to that count

8     that came from the indictment, am I -- am I correct about that?

9     I think I am correct about that.  That's --

10         MR. WRIGHT:  Yes, Your Honor.  That's in case 264.

11         THE COURT:  Right.  The indictment, right.

12         MR. WRIGHT:  Yes, Your Honor.

13         THE COURT:  Okay.  The Refuse Act charge.  I have -- I

14    have looked closely at the law on that.  The Responsible

15    Corporate Officer Doctrine is not explicitly built into the law

16    under the Refuse Act the way it is in the Clean Water Act.

17    However -- so, it seems to me that there is a legal question

18    here.  In the memos that I got for defendants Herzing and Tis,

19    the term "responsible corporate officer" is not explicitly

20    mentioned, while it is in Farrell's and Southern's, and I guess

21    my point on this is, having studied it, based on the *Park* case

22    and the Second Circuit's case that I refer to now as *Oswego*,

23    there's a pretty good argument that Responsible Corporate Officer

24    applies to the Refuse Act, but is it not the case that the

25    authority for that specific proposition is kind of thin?

1              MR. WRIGHT:  Your Honor, I'm not sure I would

2     characterize it as thin, but I would say I think the principles

3     from *Park* and *Dotterweich* where they applied it to the Food and

4     Drug Act apply to the Refuse Act.  That's always been our

5     position and it's not necessarily that you have to call it a

6     particular doctrine.  I think when we analyze causation, and

7     that's what we're dealing with here in the Refuse Act, it's what

8     caused this and, if it's somebody who had the responsibility and

9     authority to do something and then they failed to do it and that

10    leads to a discharge of refuse into the navigable waters of the

11    United States, we're not so much concerned with whether the term

12    "doctrine", quote-unquote, applies, but whether or not that

13    person is in that position.  Did they have a responsibility?  Did

14    they have that authority?  Did they fail to do something and does

15    that lead to the harm?

16             THE COURT:  I understand and, I mean, you're right.

17    The nomenclature is less important than the principle, but the

18    language is the same and, ultimately, emanates from *Park*.  And I

19    keep saying *Park*.  *Park* is based on *Dotterweich*, and *Dotterweich*,

20    now that we talk about it, is the one case I haven't read, but

21    *Park* is based on *Dotterweich* and, also, Park is a Food and Drug

22    -- Food and Drug Cosmetic Act, or whatever it is.  That statute

23    at the time did not have an explicit building in it of

24    responsible corporate officer the way that the Clean Water Act

25    does now; am I correct?

```
1              MR. WRIGHT:  I believe that's correct, Your Honor, and
2      I also believe that the Food and Drug Cosmetic Act was and still
3      may be a, quote-unquote, "strict liability statute".
4              THE COURT:  Well, I just wanted to clarify.  I mean, to
5      some extent here, I think that it's -- I can't find any case
6      where the Responsible Corporate Officer doctrine, whether you all
7      want to call it that or not, has been applied in a criminal
8      prosecution under the Refuse Act.  Now, the Oswego case is a
9      civil liability, but I can't find any case where it's been
10     applied in a criminal case, so -- and I'm not saying that I'm not
11     going to apply it.
12         What I'm saying is, I just want to clarify that we're all
13     climbing out on the same limb together here in terms of this
14     being a little bit of an extension of existing law argument
15     because, I mean, I would be much more comfortable with this if I
16     had a Fourth Circuit case that explicitly says that in the Refuse
17     Act, Responsible Corporate Officer Doctrine applies in criminal
18     cases, but I don't have any case that says that, but -- and I'm
19     not going to write an opinion in this case, by the way, so -- but
20     I am very likely going to -- and I think there are some good
21     policy reasons why it should be applied in this case, some of
22     which we've identified today, so I'm likely going to apply it,
23     but I just want to clarify that we're all sort of -- we're
24     blazing a little bit of a trail here and I want to make that
25     explicit on the record.
```

1        Anybody -- anybody else have anything to say about that?

2   Everybody has agreed, so I'm not sure what you can say about it,

3   but I just wanted to make sure that was clear on the record.

4        I've got a bunch of questions about the permit and I'm

5   looking to see if I have any other -- oh, there are a couple of

6   things before we get into the permit.

7        I want to refer you now to Corps of Engineers -- The Corp of

8   Engineers Jurisdictional Determination Form.  Do you have that

9   handy?

10            MR. WRIGHT:  Is this the -- about the navigable waters

11   of the United States, Your Honor?

12            THE COURT:  It is.  It is.

13            MR. WRIGHT:  Yes, Your Honor, I have it.

14            THE COURT:  In review this, they make a finding, it

15   appears, that -- and I just want to clarify what this means.

16   They make two findings.  One, as I understand the first one, it

17   refers to the Rivers and Harbors Act, but that's the Refuse Act.

18   That's another name for the Refuse Act, am I correct?

19            MR. WRIGHT:  Yes, Your Honor.

20            THE COURT:  All right.  And then, they make the finding

21   that waters are presently used or have been used in the past or

22   may be susceptible to use to transport interstate or foreign

23   commerce, and then they explain that the Elk River has been

24   determined to be a Section 10 stream from the mouth in

25   Charleston, West Virginia to Mile 139 near Webster Springs, and

1    I'm assuming that means that going upstream the first 130 miles

2    counts, correct?

3              MR. WRIGHT:  Yes, Your Honor, from the mouth to Mile

4    139.

5              THE COURT:  Okay, and this facility was only what,

6    about two miles from the mouth?

7              MR. WRIGHT:  Approximately, yes, Your Honor.

8              THE COURT:  Something like that?  Okay.  And, as I read

9    this finding, the language of this first finding actually covers

10   both acts, would fit the definition under either act; is that

11   correct?

12             MR. WRIGHT:  I believe that's correct, Your Honor.

13             THE COURT:  All right.  Then, the second one below that

14   is a Clean Water Act finding and the box that is checked, I don't

15   know what this means, "TNW, including territorial seas."  What

16   does "TNW" mean?

17             MR. WRIGHT:  If I could consult with my EPA lawyer,

18   Your Honor, I've been informed that it means "traditional

19   navigable water."

20             THE COURT:  What does that mean?

21             MR. WRIGHT:  All I can tell you right now, Your Honor,

22   is I'll find out.

23             THE COURT:  Well, that's fine.  I mean, I'm puzzled

24   over that term, and I figured "NW" meant "navigable water".  Now,

25   I'm wondering what "non-traditional navigable water" would mean.

1    So, if you could let me know what that means, but I think, based

2    on my review of the statutory definitions that for my purposes

3    for factual basis purposes, not only has it been stipulated to,

4    but the Corps of Engineers has found under the -- under the

5    Refuse Act, has made a finding that actually fits both statutes.

6              MR. WRIGHT:  I agree with that, Your Honor.

7              THE COURT:  All right.  Just give me a moment, please.

8         (Pause.)

9              THE COURT:  Okay.  Let's see if there's any other

10   questions I have.  Oh, I do have -- yes.  What exactly happened

11   to this tank?  I've read that there were two leaks.  Where were

12   the leaks?  Were they on the bottom of the tank?  Were they on

13   the side of the tank?  Do we know what caused them?

14             MR. WRIGHT:  Your Honor, there were two holes in the

15   bottom of the tank.  They were small.

16             THE COURT:  In the floor of the tank?

17             MR. WRIGHT:  In the floor of the tank.

18             THE COURT:  Okay.

19             MR. WRIGHT:  If you -- I actually brought some photos

20   here, if you want me to show you, but I can -- I don't have

21   photos of the tank with the holes themselves right now, two small

22   holes in the floor of the tank.  We paid for an expert to

23   analyze, and the CSB, the Chemical Safety Board, reached a

24   conclusion that they were a result of corrosion.  I think that --

25   so it wasn't a single event that happened like that.  It corroded

1    over time.

2        I don't know if the defense had experts analyze those tanks

3    and come up with some other conclusion about what caused the

4    holes to form.  I suppose it's probably the subject of much of

5    the civil litigation that's associated with this case or this

6    incident.  They were, as -- you know, if you're looking down from

7    the top of the tank, I believe, in kind of what I would call, for

8    lack of a better word, the northwest part of the tank, northwest

9    perimeter of the tank, and very close to the edge of the tank,

10   and MCHM leaked from those two holes and went out.

11       THE COURT:  And about how big were the holes?

12       MR. WRIGHT:  I'm -- I'm going to say about an inch,

13   inch and a half.  We have pictures, and I think there are

14   pictures with somebody actually holding a ruler, so I'm a little

15   hesitant to say with precise -- preciseness what the size of that

16   hole was, but an inch, inch and a half for the larger of the two.

17   I think the smaller hole was less than an inch.

18       THE COURT:  Okay.  Just when I think this stuff is too

19   technical for me, I read in Mr. Reynold's Presentence Report last

20   night that I think somebody from the DEP suggested to Mr. Farrell

21   that he put a wooden dowel in one of the holes.  So, that didn't

22   sound very technical to me.

23       MR. WRIGHT:  In fact, Your Honor, that's exactly what

24   happened, I believe, in the very early morning hours of

25   January 11th, 2014, and this person from DEP has reported to us

1    that she observed, because they dug out by the site at the tank,

2    and you could see underneath and actually see the holes from

3    underneath, and observed liquid continuing to drip out of the

4    tank on January 11th, and this person suggested plugging it and

5    they found a wooden dowel or a little wooden plug and stuck it up

6    in there.

7           THE COURT:  Well, that was my next question.  If it was

8    at the bottom of the tank, how do you get to it?  So, they just

9    dug it out?  There wasn't some sort of structure underneath the

10   tank that -- like you would think of as a crawl space under a

11   house that you had to dig down to get to the -- to the leak?

12          MR. WRIGHT:  They dug down on the side and then there

13   was an area, either had to dig it out, or it was just empty, a

14   gap of some kind where you could actually reach underneath and

15   put a plug into that hole.

16          THE COURT:  Okay.  Okay.  Now, and I'm going to get to

17   -- I'm going to get to the sort of technical aspects of this in a

18   moment when I talk about the permit, but in terms of -- first of

19   all, I understand that there was a dike there and, also, some

20   kind of floor around the tank that was supposed to capture this

21   stuff.  First of all, did that -- was that dike just around that

22   one tank, or was it around the entire facility?

23          MR. WRIGHT:  Your Honor, there was a wall around the

24   entire facility and I do have a picture of the entire facility.

25   I can set up an easel.  That's right over here.

```
 1              THE COURT:  Okay, that's fine.  I have seen a copy, a
 2   photocopy of the picture.  Is that the same picture?
 3              MR. WRIGHT:  But it's blown up a little bit, Your
 4   Honor.
 5              THE COURT:  Well, that's the problem I had with the
 6   photocopy.  It was so small, I couldn't really make out much
 7   about it.
 8              MR. WRIGHT:  As the witness had submitted -- and I'll
 9   put it over here so we can see it.
10              MR. CAREY:  Your Honor, may I add something to the
11   Court's prior inquiry of Mr. Wright about the holes before you
12   move on?
13              THE COURT:  Sure.
14              MR. CAREY:  There's no dispute, I don't think, among
15   the parties that the holes were formed by corrosion and I think
16   one hole, just for description purposes, was about the size of a
17   quarter, maybe a little larger, and one was about the size of a
18   nickel.  The question is, and where there is a dispute, is the
19   process by which that corrosion was caused.
20        There is some -- some assertion that the corrosion was from
21   the inside out caused by, you know, something that was contained
22   within the tank.  There is also, and what our expert believes,
23   was that the corrosion was from the ground up caused by, I don't
24   know, the biological and chemical process, but bacteria builds up
25   over time and, when it dies, it forms an acid and also corrodes
```

```
1    carbon steel.  So, what is not certain is to whether the
2    corrosion occurred from inside out or from the outside in.
3              THE COURT:  You know, at some point, I think this may
4    have been something I saw in media coverage about this, was there
5    -- this was in January.  Was freezing and thawing something that
6    played a role in this?
7              MR. CAREY:  It is believed that it might have some
8    role, but there's no definitive assertion about that.  There is
9    some testimony, I believe, that says some of the cracks in the
10   wall may have been caused after the sale during the -- to
11   Chemstream through the freeze and thaw process.
12        And your question about digging it up, Your Honor, the tanks
13   -- there are three small MCHM tanks.  The one in the middle is
14   the one that had the holes in it.  At the time --
15             THE COURT:  Let me come down to that photograph.
16             MR. WRIGHT:  Your Honor, just for the record, I want to
17   say that I think that whether the freezing had anything to do
18   with these holes would have been a matter of dispute.
19             MR. CAREY:  I agree.  That -- that's not --
20             MR. WRIGHT:  We don't agree with that.
21             THE COURT:  Okay, fair enough.  Let me get oriented
22   here.  We're talking about this tank right here?
23             MR. CAREY:  That's correct.
24             MR. WRIGHT:  In the middle of these three smaller tanks
25   --
```

1          COURT REPORTER:  I'm sorry.  Can you speak up just a

2     little bit, Mr. Wright, please?

3          MR. WRIGHT:  They number the tanks.  This is 393, 394,

4     395, 396, the tank that had the holes in it, 397.  These three

5     had MCHM, or the product that they sold it as.

6          THE COURT:  Okay.

7          MR. CAREY:  And, while it may not be easy to see, at

8     the bottom of each tank is what they call the chime, just goes

9     down and just sort of tapers out.

10          THE COURT:  Uh-huh.  Outward?

11          MR. CAREY:  Outward.

12          THE COURT:  Okay.

13          MR. CAREY:  And there's concrete, while not in the

14     entirety of this area, but there's concrete surrounding each of

15     those three tanks and, when the leak was discovered, it was

16     discovered in this corner.  There was some material bubbling up

17     between the chime of the concrete and so, at that point, Freedom

18     employees actually broke the concrete up and started digging down

19     to see if they could find the source of the leak and there's --

20     that's how they were able to gain access, by reaching up

21     underneath that to later put the dowel in.

22          MR. WRIGHT:  The only comment I have on what Mr. Carey

23     just said, I think the bubbling -- if the chime is right next to

24     the tank, the testimony that we've obtained, or the information

25     that we've obtained from the DEP officers who first responded

1  was, I think, that bubbling was maybe a foot or so away from the

2  tank and, if I'm not mistaken, I think there was a picture that

3  we introduced to the grand jury to show what the person testified

4  about and said that was where the bubbling was.

5          MR. CAREY:  I'm not going to say it was right beside

6  the tank, but within close proximity.

7          MR. WRIGHT:  And so it -- so it leaked out and pooled

8  at this side of the tank, and our evidence would be, Your Honor,

9  that the -- if you can hear me -- the MCHM flowed, and I'm going

10  to call this a northerly direction.  Elk River flows north to

11  south in a northerly direction.  MCHM leached into the ground and

12  came out.  There's a culvert right here and a pipe.  Now, part of

13  what we see here is padding that had been placed there to absorb

14  the MCHM or the liquids that were coming out, but it came out

15  around this pipe and flowed straight down into the river right

16  there.

17          THE COURT:  Around or through the pipe?

18          MR. CAREY:  Underneath.

19          MR. WRIGHT:  Underneath.

20          THE COURT:  Okay.

21          MR. WRIGHT:  That pipe was very corroded, so -- and it

22  got there, and there may have been some in the pipe because there

23  were holes in the top of that pipe, but when it reaches the

24  culvert or the area in which the pipe hit, it hits the pipe or

25  that area and it just flows out because there's water coming out,

1  too.

2          MR. CAREY:  And let me clarify.  The concrete, though,

3  is not underneath the tank.  There is gravel.

4          MR. WRIGHT:  Padding around the tank.

5          MR. CAREY:  There is gravel, apparently, and then it's

6  got a clay base below that, and so it's not that it pooled up

7  here and went through the wall down here, Your Honor.  The

8  majority, we believe, went actually into the ground, seeped over

9  to this channel, and then came out through here.

10          MR. WRIGHT:  It did go into the ground and I'm certain

11  some of it went into there.  There are cracks in the concrete, so

12  it could have gone in through the cracks of the concrete.

13      We also believe, and our evidence would show, that MCHM

14  continued to flow on the other side of the wall to this area

15  beyond this brick structure and flowed down and a -- this was a

16  lot of rock, or what I'm going to call riprap, and you can look

17  that word up, because it is a word, and there's a structure down

18  at the bottom of the hillside at the river bank that used to be

19  an intake for a fire suppression system that they would suck up

20  into a pipe and there was a pipe that ran from a structure right

21  here.  You can kind of see it.  It looks a little bit like a

22  flatiron building.

23          THE COURT:  Uh-huh.

24          MR. WRIGHT:  And a pipe that ran over to this side.  It

25  flowed down here and came out of this structure and you can see

1      padding or a boom.

2              THE COURT:  Uh-huh.

3              MR. WRIGHT:  To try to prevent MCHM from leaving and

4      flowing downstream, at that point, and our evidence is that's the

5      second point source.

6              THE COURT:  Okay.  Now, is this the dike wall?

7              MR. WRIGHT:  That is a part of a dike wall, Your Honor.

8      It goes all the way around the facility to include all the tanks

9      up to Tank -- I believe 405 is the last one.

10             MR. CAREY:  And you can see the wall on the backside,

11     Your Honor.

12             THE COURT:  All right.  Okay.  Is there anything else

13     you wanted to show me in this picture?

14             MR. WRIGHT:  No, Your Honor.

15             THE COURT:  It's pretty much the same thing from a

16     different angle, right?

17             MR. WRIGHT:  That's correct.

18             THE COURT:  Okay.  What was the capacity of Tank 396?

19             MR. WRIGHT:  Your Honor, I think the maximum capacity

20     was approximately 48,000 gallons.

21             THE COURT:  And do we know how much actually leaked?

22             MR. WRIGHT:  No, Your Honor.  I think we've seen

23     estimates, and I believe Mr. Reynolds did calculations and he

24     provided us information.  I -- I don't know the exact amount, and

25     I can't remember what Mr. Reynolds quotes, but it's about

 1    10,000 gallons went out.  How much went into the river, I don't

 2    think anyone has a good estimate.

 3              THE COURT:  Okay.

 4              MR. CAREY:  Your Honor, just a couple of points.  The

 5    exact amount is not determined.  Our belief was it's somewhere

 6    closer to 7,500.  When the leak was discovered there was an

 7    effort made to empty the tanks by pumping them out of the tanks

 8    into tanker cars, or trucks, I mean, and as much as could be

 9    removed of it was done that way.

10        Also, in terms of the concrete pad, my client, and I believe

11    others, believed that that concrete extended underneath the tanks

12    and, when they removed the tanks, they learned of the gravel

13    bottom.

14              MR. JOHNSON:  Your Honor, Mr. Reynolds recalls the

15    number being around 7,500, as well.

16              THE COURT:  All right.  Now, just so I'm clear then,

17    and, Mr. Wright, you indicated earlier that your -- the

18    Government's position is that the two points -- and I'm going to

19    summarize what you said -- that the MCHM was leeching into the

20    ground or flowing over the ground and finding its way basically

21    into space around existing pipes and then traveling down to the

22    river that way; is that a fair summary of what you said?

23              MR. WRIGHT:  At the -- at what I'll call the southern

24    most point source, Your Honor, that is a single pipe, and the

25    MCHM hit into what I'll call the culvert in which that pipe sits

1    and then it flowed out through that culvert and then down to kind

2    of like a little trench in the ground and hit the river, at that

3    point.  So, there's only a single pipe at that area.

4        At the northern most point source, there is a pipe there,

5    but we believe the MCHM just flowed into the ground around a

6    bunch of rocks.  Now, there is evidence that we had that there

7    was a pipe at the northern end that had MCH in it, but it's not

8    necessarily that it went into that pipe or flowed through that

9    pipe to get out.

10            THE COURT:  And those are the point sources under your

11   theory, correct?

12            MR. WRIGHT:  That's correct, Your Honor.

13            THE COURT:  And how does that fit the definition?

14   Would those be like, I don't know, discrete fissures?

15            MR. WRIGHT:  Fissures, channels, conduits.

16            THE COURT:  So, you're not -- your position is it's not

17   the tank, that the point source is actually those fissures, as

18   you say?

19            MR. WRIGHT:  The location is on the riverbank, that's

20   correct, Your Honor.

21            THE COURT:  Okay.

22            MR. CAREY:  Your Honor, perhaps I could add a little

23   bit more on the development of that channel, particularly on the

24   southern point source.  It's not well -- you can see there is an

25   external -- what appears to be a galvanized pipe that is exposed.

```
 1      This is a drainage pipe that originates off of Freedom's property
 2      on the other side between the exterior or the Barlow -- what I'll
 3      call the Barlow Street wall and the railroad tracks.  There was
 4      sort of a collection ditch that, during periods of high rain,
 5      would collect the water and it went into an opening that exists
 6      below the wall, comes across underneath the property, and over --
 7      and then came down here into the river.  This was not a
 8      stormwater pipe that was under the control of Freedom.
 9              THE COURT:  But it was a stormwater pipe?
10              MR. CAREY:  It's a stormwater pipe.  However, over
11      time, they realized that, even in dry periods, there was water
12      running underneath the stormwater pipe that was causing this
13      erosion on the bank.  And so, it is our belief that the most -- a
14      majority of the material actually went down into the ground,
15      seeped through the ground until it came over to this channel
16      underneath, to the extent it existed underneath the stormwater
17      pipe, and then came down this trench line, which is the point
18      source, down into the river.
19              THE COURT:  But, nonetheless, everyone agrees that
20      under the definition of point source, that those conditions that
21      we've described fit the definition of any discernible, confined
22      and discrete conveyance including, but not limited to, any pipe,
23      ditch, channel, tunnel, conduit, well, discrete fissure, or
24      container from which pollutants are or may be discharged?
25      Everybody has agreed to that?
```

1              MS. ROBINSON:  Your Honor, I agree that there's a point

2    source, clearly a point source here, but as to the southern most

3    leeching of the material, I don't have sufficient information.

4    Mr. Burdette has not stipulated to the fact that there was a

5    second point source.  I'm not contesting it, but I'm just saying

6    that I don't have enough information to agree with that.

7         But, clearly, I agree --

8              THE COURT:  You're talking about northern or southern?

9              MS. ROBINSON:  Southern -- or northern --

10             MR. WRIGHT:  She is talking about the northern one to

11   which she does not have enough information to stipulate.

12             MS. ROBINSON:  Where he talks about the riprap.

13             THE COURT:  Yes, that's the northern.

14             MS. ROBINSON:  So, I clearly agree that there's a point

15   source that meets all the definitions of Clean Water Act, but the

16   specifics of these discussions are not clearly agreed to by Mr.

17   Burdette in terms of the second method in which MCHM potentially

18   made its way into the Elk River.

19             THE COURT:  I don't know that it makes much of a

20   difference, but there is -- was there more MCHM coming out of the

21   southern -- the southern leak than the northern?

22             MR. WRIGHT:  Your Honor, we have -- I posed that

23   question to one of the DEP guys who was responsible for

24   responding to this incident and he said, if he had to guess, he

25   thinks more of it came out at the southern source, but he doesn't

1    know.

2              THE COURT:  Well, it would stand to reason.  It's just

3    closer to the tank.

4              MR. WRIGHT:  Yes, but he also said to us, well, there

5    was water coming out there, too, so I'm not sure how much of it

6    was water and how much was MCHM, but he said, and that's why we

7    said in our joint memo, it is believed that most of it came out

8    at the southern point.

9              THE COURT:  All right.  And now, with regard to the

10   problems with the containment, the -- there were problems with

11   the wall; is that correct, or were there problems, also, with the

12   floor of the area?

13             MR. WRIGHT:  We believe there was both, problems with

14   both.  And, in terms of containment, or secondary containment,

15   primary containment, of course, being the tank itself, secondary

16   containment would include everything, the floor and the wall

17   itself.

18             THE COURT:  And what were those problems?

19             MR. WRIGHT:  Well, it didn't hold it.  The floor didn't

20   stop anything.  So, as it leached into the ground, you know, they

21   didn't have a surface there that was impermeable that would keep

22   liquids contained within it, and then we believe at the northern

23   site, that it leached right, you know, either through or

24   underneath the very bottom of that wall into the ground and down

25   and out.

1          THE COURT:  This may -- this may get into engineering,

2     but I've been trying to picture this and, you know, the problem

3     with the wall are easy enough to picture, but the problem with

4     the floor and the containment, is there some sort of engineering

5     practice in terms of the way this should have been done where

6     some sort of liquid impermeable covering would be included as the

7     part of the floor of this facility?  Is that the way it should

8     have been done?

9          MR. WRIGHT:  Your Honor, I think there are various ways

10    in which you could create a containment area that would actually

11    work, and I think some of these were explored a little bit, one

12    of which might be called -- I think it's called a Rhino liner,

13    which is something -- and I'm thinking of kind of like a little

14    kids' pool where you buy material and kind of line it on the

15    inside of your containment area or --

16         THE COURT:  That's what I've been picturing.

17         MR. WRIGHT:  If it's concrete, then you make sure that

18    the concrete doesn't have cracks in it, make sure that the

19    concrete covers the entire area.  So, if you pour water into it

20    or liquid, then it will stay where you want it to stay and not

21    leak out.

22         THE COURT:  Okay.  I tell you what, we've been going

23    for about an hour and 15 minutes.  I've got -- before I get into

24    probably my biggest area of inquiry, which is the permit itself,

25    and related issue of causation, I think we'll take about a

1    ten-minute break.

2         (Recess taken.)

3         THE COURT:  All right.  Let's talk about the permit.

4    We'll get to the plan requirements of the permit in a moment, but

5    I want to ask some general questions about the permit.  I don't

6    know, in the end, if this makes a whole lot of difference, but

7    this appears to be a form and, in fact, there's nowhere on the

8    face of the permit where either Freedom or ERT is specifically

9    mentioned.  Now, there's a signature back there that I can't

10   read.  I'm not sure whose signature that is.  Whose signature is

11   that, actually?

12        MR. WRIGHT:  Your Honor, I believe that's Scott

13   Mandirola.  It says "director", and he holds a position with the

14   DEP.

15        THE COURT:  All right.

16        MR. WRIGHT:  State agency.

17        THE COURT:  So, the permit doesn't mention Freedom or

18   ERT by name, so this appears to be a form; is that correct?

19        MR. WRIGHT:  It is what's called a general permit, Your

20   Honor, and it applies across a broad range of industrial

21   activity.  So, instead of printing up or tailoring individual

22   permits or potentially thousands of companies that might need to

23   operate under this system, they have a general permit, and then

24   people can apply for a registration under that and the Exhibit 3

25   to the -- and I'm just looking at one of the memos that we filed.

1       This was actually a joint memorandum filed in the cases of Mr.

2       Farrell and Mr. Southern regarding the factual bases for their

3       guilty plea.  It was Exhibit 3 to that particular memo.

4               THE COURT:  Is that an e-mail?

5               MR. WRIGHT:  It was an e-mail from the DEP to -- dated

6       November 17th, 2009.  Now, it's addressed to Mr. Hutchinson, the

7       manager, although, by that time, Mr. Hutchinson had passed away.

8       So, he's no longer working at the site or -- and his position is

9       filled by someone else; at that particular time, I believe it was

10      Mr. Arthur, but it references the general permit, which is Permit

11      Number WV0111457.  The particular registration for Freedom is

12      listed in that e-mail, which is Exhibit 3, as WVG610920.  So,

13      that's their individual registration to operate under the terms

14      of this general permit.

15         And there are many companies that would have their own

16      registration number.  I think Poca Blending had its own

17      registration number to operate under this same permit.

18              THE COURT:  And the permit says, "Subject to stormwater

19      associated with individual -- or industrial activity."  I've been

20      trying to pin down exactly what that means, and here's -- here is

21      my layman's summary of it based on what I read, and that is that

22      this is a facility that handles materials that we don't want to

23      get into surface waters, and it's out in the open where rain or

24      stormwater could potentially wash those materials into surface

25      waters and, therefore, the permit allows only the stormwater to

1    be discharged into the surface waters and is designed to avoid

2    having any of those materials on-site end up into the surface

3    waters.  Is that -- that's a layman's summary of my understanding

4    of this.  Is that generally correct?

5            MR. WRIGHT:  I believe it is, Your Honor.

6            THE COURT:  Okay.  So, legally, though, why was a

7    permit required for this site?

8            MR. WRIGHT:  Your Honor, a permit is required for

9    stormwater discharge associated with industrial activity, and the

10   cite for that, the legal requirement, can be found in Title 33,

11   Section 1342(p) and, as with many sayings associated with

12   regulatory offenses, sometimes the language in the CFR are not

13   very easy to read and to understand, but I think a fair summary

14   of the requirement is stated in the case of *Alaska Community*

15   *Action versus Aurora Energy Services*.  The citation -- and I'll

16   provide a copy.

17       Your Honor, may I approach --

18            THE COURT:  You may.

19            MR. WRIGHT:  -- with a copy for you?  I'm referring

20   specifically to Page 1171 of the cite, of the case, which I

21   believe is the third full paragraph under Roman Numeral I of the

22   opinion where it states, "An NPDES permit is required for

23   stormwater discharges associated with industrial activity," and

24   it cites the statute section that I just mentioned, 33 United

25   States Code Section 1342, Subparagraph (p), with a further

1    citation to 40 Code of Federal Regulations Section 122.26(c)(1).

2    There's a particular definition in 122.26 governing stormwater

3    discharges associated with industrial activity, and that is also

4    referenced in the case further down in the paragraph.   Stormwater

5    discharge associated with industrial activity is defined as "The

6    discharge from any conveyance that is used for collecting and

7    conveying stormwater and that is directly related to

8    manufacturing, processing, or raw material storage areas at an

9    industrial plant."   That citation is 122.26(b)(214).   That

10   particular section in the Code of Federal Regulations Title 40

11   also says that, "The term 'stormwater discharge' is associated

12   with industrial activity includes, but is not limited to, storage

13   areas, including tank farms for raw materials and intermediate

14   and final products," and I believe that is the legal authority

15   for the basis for saying they had to have a permit.

16           THE COURT:  That last thing you cited is not actually

17   listed in this opinion; is that correct?

18           MR. WRIGHT:  The last quote I mentioned is -- correct,

19   that is not in that opinion.  I read from the CFR.

20           THE COURT:  And what was the cite on that again?

21           MR. WRIGHT:  122 -- it's Title 40 of CFR 122.26,

22   Subparagraph (b)(14).

23           THE COURT:  Now, that is -- that is cited --

24           MR. WRIGHT:  They do cite to that provision in that

25   opinion.  They didn't include everything that's in (b)(14) in

1    that opinion.

2         THE COURT:  Well, I mean, here's -- this is the -- this

3    is what's been sort of frustrating about reading the law on this

4    and reading these permits, is that just when you think you know

5    what it's talking about, then you see language that makes you

6    think you don't know what you're talking about, me, and this

7    passage in this opinion actually is a great illustration of that:

8         "Stormwater discharge associated with industrial activity"

9    is defined as "The discharge from any conveyance that is used for

10   collecting and conveying stormwater," which sounds like storm

11   drains to me, "and that is directly related to manufacturing --

12   and directly related -- to manufacturing, processing, or raw

13   material storage areas at an industrial plant."  I'm -- I mean,

14   I'm assuming they had storm drains in this facility, but that's

15   not what was at issue here; is that correct?

16        MR. WRIGHT:  That is correct.  They did have storm

17   drains from which they were supposed to monitor the water, which

18   allowed these reports to see what was in that water.

19        THE COURT:  And those, as it turns out, even though

20   that's what -- why the permit was required, as it turns out,

21   those storm drains were not involved in this, but that's what --

22   but it's those storm drains that is what required the permit; is

23   that correct?

24        MR. WRIGHT:  The storm drains, but I think, also, Your

25   Honor, the definition, when you continue into (b)(14) of the Code

 1    of Federal Regulations section that I read from, it goes beyond

 2    what's in that opinion, and it included stormwater discharges

 3    from storage areas, including tank forms for raw materials and

 4    intermediate and final products.

 5              THE COURT:  And under that definition it doesn't really

 6    matter if you have storm drains.  It's just that there's a

 7    potential for stormwater to go from the facility somewhere like a

 8    river.

 9              MR. WRIGHT:  Yes, Your Honor.

10              THE COURT:  Okay.  Well, even so, that's the legal

11    basis for having a permit.  They had a permit.  So, let's talk

12    about the permit.

13         Reading this permit reminds me of reading an insurance

14    policy.  If you've ever really tried to read the language of an

15    insurance policy and you thought, well, this is what this will

16    say, this will be clear, and you go to read it and it says sort

17    of that in language that is frustratingly not what you expect,

18    that's kind of how it's been to try to read this permit.

19         First of all, the first few pages of the permit are talking

20    about various sectors.  First, actually, maybe the first half or

21    so of the permit is talking about Sectors A. through U.  It

22    appears that this facility is not covered through -- I'm sorry,

23    A.  through V., that this facility is not covered by Sectors A.

24    through V.; am I correct about that?

25              MR. WRIGHT:  A. through --

1      THE COURT:  V.?  In other words, what I mean is,

2  there's a catchall at the end called "Sector W" that says,

3  "Stormwater discharge is associated with industrial activities

4  for facilities that are not covered under Sections A. through V."

5  I'm assuming this facility falls under Sector W.

6      MR. WRIGHT:  Your Honor, I would agree with you, except

7  for this point to be made and, again, I'm going to refer to

8  Exhibit 3 to the joint memo that was filed in the case of Mr.

9  Farrell and Mr. Southern on October 26th, 2015, and that

10  specifically says that you are subject to the monitoring

11  requirements of Sector I-A of the general permit.  I don't want

12  to comment on the DEP's rationale, but I agree, I don't think

13  that's the right sector.  They were told they were under Sector

14  I-1.

15      THE COURT:  So, that Sector I is motor freight

16  transport facilities, passenger transportation facilities,

17  petroleum bulk oil stations and terminals, rail transportation

18  facilities, and United States Postal Service transportation

19  facilities.  I kind of agree with you.  That doesn't look like

20  that applies here.

21      MR. WRIGHT:  But they were specifically told I-1, and I

22  believe the discharge monitoring which was filled out and

23  submitted monitored the pollutants listed under I-1 and not W.

24      THE COURT:  And those monitoring requirements, those

25  have to do with testing of -- the testing of water being

1        discharged through the stormwater system; is that correct?

2                MR. WRIGHT:  That's correct, Your Honor.

3                THE COURT:  Okay.  One of the things I've had a hard

4        time pinning down, you know, as a practical matter, I'm pretty

5        sure no Government authority is going to grant a permit that

6        would allow this discharge.  However, trying to find language in

7        here that definitively says that is a little bit harder.  The

8        general prohibition upon anything other than water being

9        discharged from this facility is contained in Section B-2 on Page

10       24; am I correct about that?  It lists a whole series of things

11       that are permissible, none of which would include MCHM, I'm

12       pretty sure, but I just -- I'm trying to box this thing in.

13           An element of at least two of the three of these charges

14       includes a violation of the permit, so I'm trying to work with a

15       permit here that, frankly, is not the easiest thing to read,

16       especially when you don't have a background in this, and be able

17       to point to language that definitively says that discharge of

18       MCHM would not be permitted under this permit.

19               MR. WRIGHT:  I agree with what you just said, Your

20       Honor, but Page 24 is the permit and I tried to walk it through

21       in the joint memo, but it didn't have a permit to discharge MCHM.

22       I referred back to Exhibit 3, authorizing the registration of the

23       facility under the permit, and then subject during the monitoring

24       requirements of I-1, and then I referenced MPDS at Page 24, and

25       12 and 13, basically saying you can discharge stormwater that

1   contains a certain amount of the substances that you have to

2   monitor, but nothing else.

3           THE COURT:  I'll give you another example of language

4   that I found a little frustrating, is on the next page under

5   Section 3.  It says, "This permit does not relieve the permittee

6   of the reporting requirements under 40 CFR 117 and 302.  The

7   discharge of hazardous substances into stormwater discharge from

8   a facility shall be minimized in accordance with the applicable

9   stormwater Pollution Prevention Plan for the facility and in no

10  case during a 24-hour period shall a discharge contain a

11  hazardous substance equal to or in excess of reporting

12  quantities."  I have no idea what that means.  And that's the

13  kind of language I'm looking at and saying, well, was there some

14  amount of MCHM that can -- that can be discharged under this?

15          MR. WRIGHT:  Your Honor, I don't believe I submitted

16  this as a part of this memorandum, but when they apply for the

17  permit, they have to list the hazardous substances that they have

18  on board and they did not include MCHM in the application itself.

19  So, to the extent that that paragraph has any bearing on it at

20  all and would authorize release of anything, it would at least

21  have to be something that they had reported, and they had not

22  reported or listed MCHM.

23          (Telephone rings.)

24          MR. MOORE:  Your Honor, I'm sorry.  I thought I had cut

25  this phone off.  I'm sorry.

1          THE COURT:  It happens once in awhile.  I'll give you a

2     pass the first time.

3          MR. MOORE:  I understand.

4          THE COURT:  This is not a baseball diamond.  There

5     won't be three strikes.

6          MR. MOORE:  I understand.

7          THE COURT:  So, what you're saying is, that there --

8     they have to -- this only applies to things that they would

9     report?

10          MR. WRIGHT:  Your Honor, I -- I'm not an expert, so I

11     can't say for sure but, I think, to the extent that they're

12     allowed to release anything, it would have had to have been

13     something that they reported.

14          THE COURT:  Okay.  Let's see what your environmental

15     lawyer has to say about that.

16          MR. WRIGHT:  EPA's position is basically this is the

17     same, that they're not relieved from having to report under other

18     laws like, for example, what's known as RCRA, which is the

19     resource -- I forget what that stands for.  It's called RCRA.

20     And there's some other statutes dealing with toxic substances.

21     They have specific reporting requirements under that that they're

22     not relieved of from complying with simply because they have this

23     permit and I don't think that provision really applies here.

24          MR. CAREY:  Your Honor, we dispute that MCHM is a

25     hazardous substance under both RCRA and TSCA.  We do recognize

1    that it was regulated for exposure to employees under OSHA regs,

2    but it was neither hazardous substances under RCRA and TSCA.

3              MR. WRIGHT:  Well, I'm not saying that it is, Your

4    Honor.

5              MR. CAREY:  Okay.

6              MR. WRIGHT:  So, if he's disputing, he's disputing

7    something I didn't say.

8              MR. CAREY:  I'm sorry.  I misunderstood, Phil.  I

9    thought that you --

10             MR. MOORE:  And I agree with Mr. Carey to the extent

11   that there's an issue there.

12             THE COURT:  I'm still not sure I understand what that

13   particular provision means.  Can anybody point to any provision

14   of this permit that would allow any quantity of MCHM into the

15   stormwater?

16             MR. WRIGHT:  I don't believe there are.

17             THE COURT:  I think that's right, but with not having

18   any expertise on this and with the vagaries of this document, I'm

19   not sure that I'm ever going to be able to say that with a

20   hundred percent, but I think that's right.

21        All right.  Now, let's move on to the heart of this thing,

22   the plans.  As I see it, the heart of all these charges is the

23   lack of a stormwater plan and the lack of a groundwater plan.

24   Let's talk about the stormwater plan first, and I want to make

25   sure -- want to make sure I understand this language and how this

```
 1    ties in.  The Government's --
 2         (Telephone rings.)
 3              MR. MOORE:  I'm just going to take it out, Judge.  I
 4    thought I had cut it off.
 5              THE COURT:  Why don't we just give it to a CSO.
 6              MR. MOORE:  Okay.  I'm sorry, Judge.
 7              THE COURT:  You'll be able to retrieve it after.
 8              MR. MOORE:  Yes, Your Honor.  I apologize.  There's no
 9    excuse.
10              THE COURT:  I agree, but we'll move on.
11         (Telephone rings.)
12              MR. ELLIS:  Strike three.
13              THE COURT:  We might need to destroy it.
14         (Laughter.)
15              THE COURT:  All right.  The basis of liability in these
16    cases, as I understand it, is the lack of both -- both the lack
17    of a stormwater and groundwater plan and the lack of the
18    implementation of those plans.  In other words, if proper
19    groundwater plans had been in place, groundwater plan -- well,
20    I'm sorry -- stormwater plan and a proper groundwater plan had
21    been in place and properly implemented, then it may not have
22    prevented the leak from the tank, but it would have prevented the
23    materials from getting into the Elk River.
24              MR. WRIGHT:  That is correct, Your Honor.
25              THE COURT:  All right.  And, when it gets rights down
```

1    to it, in terms of the practical terms, what the proper placement

2    and implementation of those plans would have done is make sure

3    that that containment held that material.

4            MR. WRIGHT:  Yes, Your Honor.

5            THE COURT:  All right.  So, let's look at the

6    requirements of the stormwater plan.  So that theory only works

7    if the required plan is necessarily going to bring that back.

8    Under the stormwater requirements, stormwater pollution

9    prevention plan requirements in the permit under Subsection

10   (a)(2)(c) entitled "Preventive Maintenance", it states, and, this

11   is -- again, this is a part of the requirements for a stormwater

12   pollution prevention plan contained in the permit, and Subsection

13   (a) is the contents of the plan, and the first part of that is a

14   description of potential pollutant sources.  The second part is

15   stormwater management controls.  I think that word "controls" is

16   important.

17       Under Subsection (c) of that, "Preventive Maintenance," it

18   says, "Preventive Maintenance Program shall involve inspection

19   and maintenance -- inspection and maintenance -- of stormwater

20   pollution prevention devices," and then it gives some examples,

21   "as well as inspecting and testing plant equipment and systems to

22   uncover conditions that could cause breakdowns or failures

23   resulting in discharge pollutants to surface waters."

24       Now, the first question I have on that is, is there any

25   definition of "stormwater pollution prevention device" other than

1    the plain language of this permit?  And, I will tell you, I have

2    not been able to find one.

3              MR. WRIGHT:  I'm not aware of one.

4              THE COURT:  All right.  So -- and, for that matter,

5    plan equipment and systems, is there any definition of that other

6    than the plain language of the permit?

7              MR. WRIGHT:  Not that I know of, Your Honor.

8              THE COURT:  All right.  So, are we including -- are we

9    in agreement and including this containment system, the dike wall

10   and floor, would that be included in the definition then of

11   "stormwater pollution prevention devices"?

12             MR. WRIGHT:  As well as "plan equipment systems and

13   breakdown could cause a discharge into the surface water."

14             THE COURT:  Right.  That would be included in both

15   those phrases.

16             MR. WRIGHT:  Yes, Your Honor.

17             THE COURT:  Any objection to that?

18        Okay.  Now, then we go over and Subsection (c) there doesn't

19   talk about when that has to be done, but that then is covered, I

20   think, under Subsection (b) on Page 33, which states in pertinent

21   part that, "A cite inspection shall be conducted annually by

22   appropriate personnel named in the stormwater pollution

23   prevention plan to verify, among other things, that the controls

24   -- controls -- to reduce pollutants in stormwater discharges

25   associated with industrial activity identified in the stormwater

```
1    pollution prevention plan are being implemented and are

2    adequate."  Is that how we tie in the inspection requirement to

3    the control, among other things, preventive maintenance?

4             MR. WRIGHT:  Partially, Your Honor, although I think

5    Subparagraph (c) that's on Page 32 mentions inspecting and --

6             THE COURT:  Well, it doesn't say how often, though.

7    That's my point.

8             MR. WRIGHT:  And, just as another point, Your Honor, in

9    the general paragraph, it doesn't have a subparagraph that

10   begins, too, with stormwater management control on Page 32, but

11   simply says they have to implement such controls.  Now, that's a

12   command.  Do that.  And, you're right, it doesn't say when do

13   they have to do it, but if you're going to have a plan, and you

14   have a facility, and you're going to operate under this permit,

15   then you have to do it and, you know, they had the permit and

16   were operating under this permit since the facility was purchased

17   from Pennzoil.

18            THE COURT:  So, you're -- so, you're saying that the

19   word "controls" there would include the dike and the containment

20   system?

21            MR. WRIGHT:  Well, yes, Your Honor, storm management

22   controls and the controls that they have to implement and include

23   preventive maintenance, which is then explained in that

24   Subparagraph (c).

25            THE COURT:  Okay.  So, Subparagraph (c) then is the key
```

```
 1   to that.
 2          MR. WRIGHT:  It is, if you're just parsing the
 3   language, Your Honor, and I think -- but, generally, this whole
 4   section is a command to all those who operate under this permit
 5   and take this stuff seriously.  Form a Pollution Prevention
 6   Committee.  Don't just come up with a plan and stick it in a
 7   shelf and let it gather dust.  Take it seriously, implement these
 8   things, and use common sense to prevent discharges into the Elk
 9   River.
10          THE COURT:  I agree with that, but words mean things,
11   and we're talking about criminal liability here, so I need
12   something more than the general intent of the plan here to loop
13   this together.  The theory is that the failure to implement this
14   plan is what -- was at least a cause of this discharge and my
15   question and, really, the central question I've had is, okay, if
16   this was in place, what would have -- what is it about the plan
17   that would have prevented the discharge?
18          MR. WRIGHT:  And I agree, Your Honor, with everything
19   you've just said in terms of walking through this particular
20   language and I think that's the key.  In terms of the specific
21   language in the permit, that's the key.
22          THE COURT:  All right.  Does anybody have any -- does
23   anybody else have anything to say about that?
24      All right.  Let's move on then to the groundwater
25   requirements, which I actually think gets a little more tricky.
```

```
1     Under -- this is on Page 34 under (b)(1), pretty clear that tanks
2     are going to be -- and, in particular, tanks containing
3     contaminants are going to be covered under a groundwater plan,
4     correct?
5               MR. WRIGHT:  Yes, Your Honor.
6               THE COURT:  Okay.  Now, this one -- this part of the
7     permit is not as specific, but on Subparagraph (8), it says, "The
8     plan must contain, at a minimum, provisions for quarterly
9     inspections of the facility to ensure that all elements and
10    equipment of the groundwater protection programs are in place,
11    functioning properly, and are appropriately managed."  Would
12    "elements and equipment" include the containment system here that
13    we're talking about?
14              MR. WRIGHT:  That is our position, yes, sir.
15              THE COURT:  The thing that I've wrestled with, with
16    this particular -- with this particular section, is that it
17    references 47-58-4.11, et seq., and refers to that as the
18    groundwater protection regulations.  However, I discovered that
19    the -- the particular containment regulation that is referenced
20    in your briefing, 47-58-4.8, actually is A., is not actually
21    included in that citation.  In other words, 4.11, et seq., does
22    not include 4.8.
23         Now, just to give some context to this, 4.8 is the
24    regulation which requires containment that will hold a spill for
25    72 hours, which is on -- at least initially to me looks -- looks
```

1    pretty applicable to this case because it's obvious that the

2    containment didn't hold it for 72 hours.  That's been the

3    Government's position.

4         The concern I have about this is, when I first looked at it,

5    I thought that that provision, that 4.8, was specifically

6    incorporated by reference in this groundwater protection plan

7    requirement section, but it turns out it's not.  So, my question

8    is, how is it then applicable to this plan?  Now, you know, it's

9    out there.  It applies to tanks.  In fact, I think the title of

10   it is maybe "Sumps and Tanks."  So, it probably applies even

11   outside of the context of the permit even, but it -- as I've

12   thought about it and tried to wrestle with this particular

13   language, I look at the language in the permit requirements and

14   that Subsection (8) where it says, "Ensuring that the elements

15   and equipment are functioning properly," and could that be read

16   to mean, among other things, complying with this containment rule

17   contained in Section 4.8?

18        In other words, if you had a groundwater protection plan in

19   place you were properly implementing, would that necessarily mean

20   you would have to comply with 4.8 even though it's not

21   specifically referenced in the permits?

22             MR. WRIGHT:  That is a very -- almost word for word

23   what we put in our joint memorandum, Your Honor, on Page 15, what

24   you just said, that the section that is specifically incorporated

25   by reference to 4.1.  When you read that, all it does is say what

1    has to be in your groundwater protection plan, what do you

2    actually have to put on the pieces of paper that is your plan.

3              THE COURT:  And that's largely mirrored here, is it

4    not?

5              MR. WRIGHT:  Yes.  And our position that we filed in

6    the joint memorandum is that in order for your elements and

7    equipment to protect the groundwater and protect pollution of

8    places like the Elk River, is that they have to function

9    properly, and how do they do that, and then you just refer back

10   to basically a page previous in the -- two pages earlier in the

11   regulation dealing with sumps and tanks and, specifically, with

12   above-ground storage tanks, and their secondary containment,

13   4.8(a).

14             THE COURT:  And this is -- really, this is kind of an

15   academic question, but for purposes of Count One, you could have

16   charged that based on that regulation without the permit at all,

17   couldn't you?

18             MR. WRIGHT:  Yes, Your Honor, and I think that would

19   have been part of our evidence, that this is one independent way

20   to get to establishing a standard of care.  You have to comply

21   with the state regulation.

22             THE COURT:  Okay.  All right.  Any objections to any of

23   that?

24        Okay, I think that's all the questions I have about the

25   permit.  The next couple of questions I have relate to Count

1    Three, which only applies to Southern and Farrell.  Count Three,

2    which is a negligent violation of a permit, appears to be based

3    only on the stormwater plan.

4         MR. WRIGHT:  That is correct, Your Honor, and that has

5    been a source of some discussion between my office and the EPA.

6    The Code of Federal Regulations, which governs protection of the

7    environment, specifically allows for the State to take over the

8    NPDES Program pursuant to the delegation from the EPA, and they

9    can -- and the section that allows them to do this or talks about

10   the State's authorization and authority is Section 123.25 of

11   Title 40 of the Code of Federal Regulations, which says that,

12   "States are not precluded from omitting or modifying any

13   provision to impose more stringent requirements."

14      It is the position of the EPA and through the experts on

15   this, a groundwater protection plan is one of those more

16   stringent requirements.  So, that's why we didn't include it in

17   the violation of the permit condition under the federal law.  I

18   don't know that it makes much difference but -- because they

19   didn't have either one of them.

20        THE COURT:  Right.  Well, the State clearly was

21   requiring that, although they allowed a possibility of one

22   consolidated plan.

23        MR. WRIGHT:  That's correct.

24        THE COURT:  Okay.  All right.  And so here's -- here's

25   my main question on Count Three, and that is, the condition that

 1    was violated had -- has to implement either Section 1311 or 1318

 2    of the Clean Water Act, or both, and the question I'm having

 3    there is, 1318, as I understand, is a recordkeeping requirement,

 4    so I'm really puzzled by that one, but 1311 is the one that

 5    generally forbids discharge of pollutants.  How is it that the

 6    requirement to have a stormwater plan implements either one of

 7    those sections?

 8             MR. WRIGHT:  Your Honor, I agree that it's not very

 9    clear when you read these permits, but our position is that it

10    implements those two sections in two ways.  First, the condition

11    that requires there to be a stormwater plan further requires that

12    certain practices be put in place to reduce the pollutants and

13    stormwater discharges associated with industrial activity.  And

14    I'm looking at Page 29 of Paragraph 17 of the permit.  "Plan

15    shall describe and ensure the implementation of practices which

16    are to be used to reduce the pollutants in discharges associated

17    with the industrial activity at the facilities and to assure

18    compliance of the terms and conditions of the permit."

19        1311 says that you shall not discharge waters into -- or

20    pollutants into the waters of the United States except in

21    accordance with some other section.  In other words, if you're

22    allowed to do it, you can do it but, otherwise, no, you can't.

23    That's essentially what Paragraph 17 says.  That's the argument

24    that we have on why it implements Section 1311.

25        1318, Your Honor is correct --

1          THE COURT:  Well, hang on.  I want to make sure I

2   understand this.  You got ahead of me there on Page 29.  Which

3   language are you referring to?  I know it's under Subsection

4   (17).

5          MR. WRIGHT:  It's the first paragraph in the -- under

6   (17), more or less in the middle of the paragraph.  The two --

7   the key sentence is beginning with "In addition".

8          THE COURT:  Okay.  And --

9          MR. WRIGHT:  The very next page, on Page 30, first full

10  paragraph beginning with, "All excluding PPPs are considered

11  reports that shall be available to the public under Section

12  308(b) of the Clean Water Act," is they have to have a plan, and

13  then they have to make it available as one of the reports under

14  Section 308(b) of the Clean Water Act.  Section 308(b) of the

15  Clean Water Act is classified at the United States Code Section

16  1318(b).  So, 308(b) generally, as they refer to it as a Clean

17  Water Act, is 1318.

18          THE COURT:  Let's go back to 1311 first.  Let me just

19  see if I can spin this out and understand it.  The permit

20  condition that was violated was the requirement of a stormwater

21  plan.  The stormwater plan implemented, if -- if properly put in

22  place and implemented -- would itself implement Section 1311

23  because it's designed to prevent unauthorized discharges.

24          MR. WRIGHT:  That's correct, Your Honor.

25          THE COURT:  Okay.  And having a stormwater plan in

1    place and properly implemented but, in this case, more in place,

2    implements Section 1318 because it would be -- it's a report that

3    is required to be made public under Section 1318.

4                MR. WRIGHT:  That's correct, Your Honor.

5                THE COURT:  So, they're supposed to have one, they're

6    supposed to make it public and, therefore, it implements 1318?

7                MR. WRIGHT:  Yes, Your Honor.

8                THE COURT:  Okay.  Anybody else have anything to add on

9    that?

10        All right.  A final question on a completely different

11   subject, going into these sentencing hearings, where does the

12   Government stand on the issue of restitution?

13               MR. WRIGHT:  Your Honor, we've taken the position, and

14   we took it initially with Freedom and we did so explicitly in

15   other plea agreements, subsequent plea agreements, that trying to

16   allocate resources to figure out, for example, hotels,

17   restaurants and businesses that suffered losses because of the

18   deprivation of clean water from the water company because the

19   MCHM flowed into its intake would be -- and I forget the exact

20   language -- but, basically, too hard to do and would lengthen the

21   sentencing process beyond what is reasonable.

22        There are already avenues set up in the Bankruptcy Court to

23   allocate and to determine who should get what from the resources

24   of Freedom from the remaining assets that they have.  We've

25   carved out a possible exception in two plea agreements, and I

1    would say it was the latter two, only because we didn't have the

2    information prior to this, but the DEP submitted a claim for

3    losses it sustained in working at the facility itself, not from

4    losing clean water, and it included personnel costs; it included

5    travel; it included some other things, which I've subsequently

6    learned having, for example, to replace articles of clothing that

7    were contaminated, or just boots that were just basically

8    rendered useless from having to walk around in this stuff and the

9    odor was pretty bad.

10          I still don't have a breakdown because the invoice that I

11   received just had a general thing for personnel costs.  It didn't

12   list what those costs were.  I got a subsequent breakdown between

13   regular hours and overtime hours.  Unless I can find some law on

14   this, I don't think they should be entitled to compensation for

15   regular hours, but I don't have a breakdown of what the overtime

16   hours were from the thing they gave me.  So, right now, I don't

17   think I even have enough to give to the Court and say they should

18   get restitution for "X" amount for the DEP, but for the people

19   who I'm going to call them downstream from the water company, I

20   think that would lengthen the sentencing process beyond reason.

21   We would be here forever, and there would be many issues,

22   proximate causation for their loss, the negligence of others,

23   potentially, and it would be too difficult.  That was our

24   position.

25               THE COURT:  So, the bottom line is that the Government

```
1    is not going to be seeking restitution at these sentencing

2    hearings?

3            MR. WRIGHT:  I may get something from the DEP for their

4    particular costs that I can justify but, right now, I don't have

5    it.

6            THE COURT:  Okay.  One other question I do have, and I

7    thought of this just a moment ago, we were talking about Count

8    Three and the way in which Sections 1311 and 1318 are implemented

9    by the stormwater plan.  Do you have any authority for that, any

10   cases that support that particular legal theory?

11           MR. WRIGHT:  I'll look again, Your Honor.  If I had, I

12   should have cited it and, if I didn't cite it yet, then I'm not

13   sure I have it.

14           THE COURT:  Okay.  I can't -- I've read so much stuff,

15   at this point, I can't remember if you did or not.  I'll be

16   taking a look at it, but okay.

17       Any -- that's all the questions I have.  Does anybody else

18   have anything to raise, at this point, before we go to the

19   individual sentencings?

20           MR. WRIGHT:  Just some recordkeeping.  First, the

21   demonstrative exhibit you're looking at, I want to put on the

22   record that was a photograph taken by an individual who, I think,

23   rented a plane or something, was up in the air, obviously, and

24   taken, just for the record, I believe, on January 13th, 2014; so,

25   within four days, certainly, and within a week of the discharge
```

```
 1    of the MCHM.
 2         And I also have, and I can give copies to counsel, if I can
 3    approach, the safety data sheet from Eastman, which is dated
 4    August of 2011, and a safety data sheet produced by Freedom
 5    Industries for the substance that was in that tank.
 6         May I approach?
 7              THE COURT:  You may.
 8         Mr. Carey?
 9              MR. CAREY:  Your Honor, I'm not sure if it's
10    appropriate now but, if I may, the Court, through its
11    questioning, has raised two or three issues that, to me, may
12    require further development of information to provide to the
13    probation officer in relation to the Presentence Report.  Our
14    time to respond to the Probation Department has passed.  Could we
15    have a few days for whatever additional information we think that
16    the probation officer should consider for inclusion in the PSR?
17              THE COURT:  I'll leave that up to the probation
18    officer.  They've got deadlines to live with.  I mean, as a
19    practical matter, I need -- especially on these cases, I need to
20    get the final Presentence Report in several days ahead of time.
21    Normally, I'm not looking at that stuff until probably a day or
22    two before the sentencing, but this is not normal -- not a normal
23    case.  So, I need to be able to get that in and look at it well
24    in advance of the hearing.  So, I'm not sure.  Mr. Lambert is
25    sitting in the back.
```

1           Mr. Lambert, when is your Presentence Report due to me in

2    the Farrell case?

3                PROBATION OFFICER LAMBERT:  Tomorrow, Your Honor.

4                THE COURT:  Okay.  Well, I'm not sentencing Farrell for

5    another two weeks or so, right?

6                MR. CAREY:  The 11th, I believe, Your Honor.

7                THE COURT:  Okay.

8                MR. CAREY:  If we could get him something by Monday,

9    Your Honor, would that be all right?

10                THE COURT:  Well, it depends on what you're getting

11   him, because it depends on what it's going to do to his report.

12   I mean, if I'm going to sentence him on the 11th, the last day I

13   would probably want to get the report is the 4th.

14                MR. CAREY:  Okay.

15                THE COURT:  Now, Monday is the 1st, so you can get him

16   information, but I'll let him know now that the last day I would

17   want to get that report is the 4th.

18                MR. CAREY:  I don't expect it to be substantial.

19                MR. MOORE:  I'm in the same boat, Your Honor, but I

20   think that the deadline for Mr. Gwinn to get a report to you is a

21   little bit later, maybe only by a couple of days.

22                THE COURT:  Well, I know Mr. Southern's sentencing is

23   about a -- about five or six days later than Mr. Farrell's.

24                MR. MOORE:  Yes, sir.

25                THE COURT:  So, same time frame.

1          MR. MOORE:  Right.

2          THE COURT:  I am -- I am very committed to getting

3     these cases resolved as they're scheduled.

4          MR. MOORE:  Yes, sir.

5          THE COURT:  I'm sure everybody probably is interested

6     in that.

7          MR. MOORE:  I think that's correct, Your Honor.

8          MR. CAREY:  We agree, Your Honor.

9          THE COURT:  Having said that, I think the time --

10    similar time frames, I mean, I'm far more familiar with these

11    cases before I'm ever even getting the Presentence Report than I

12    am typically in any case I handle.  So, there's -- there is some

13    new material in the Presentence Reports, but not a lot of it is a

14    surprise to me.  So, that's fine.

15         MR. WRIGHT:  Your Honor, I'm not committed yet to

16    filing a sentencing memo on every single one of these cases.

17    Obviously, the Presentence Reports are very lengthy, and very

18    comprehensive, and I don't want to give anything more to the

19    Court than you need to read that you already haven't read, but I

20    don't know what their information is, and I don't know if I'm

21    going to want to file a sentencing memorandum and, right now, I'm

22    a little hesitant to turn on my cell phone to check my calendar,

23    but if that would affect the deadlines in filing a sentencing

24    memorandum, I would like to have additional time to file

25    something if they're going to raise something that I would want

1    to address.

2              THE COURT:  Well, let's cross that bridge when we get

3    to it.  A sentencing memo is probably something I wouldn't

4    actually look at until a day or two before the hearing from

5    either side probably, unless it affects the guideline calculation

6    or something like that, but let's -- let's just deal with that on

7    a case-by-base basis.  If you need additional time, you can ask

8    for it.

9              MR. WRIGHT:  Thank you, sir.

10             THE COURT:  Anybody else?

11        Before we go, I think -- my staff pointed out to me, I think

12   it would be helpful to put a couple of things on the record about

13   the photograph we were looking at earlier because I'm not sure

14   the record would be entirely clear.  We do have a photocopy of

15   that photograph already in the record.  I think it was filed with

16   somebody -- maybe with one of the Government's briefs.

17             MR. WRIGHT:  Your Honor, I looked at that, and I think

18   the one I filed is from a slightly different angle.  I could

19   produce a smaller version of that and submit it to the Court.

20             THE COURT:  I think that would be a good idea as an

21   exhibit for this hearing, but even so, we talked about a lot of

22   the things that are depicted there and I'm not sure we made a

23   great record of exactly what we were talking about.  Some of it,

24   we did; some of it, we didn't.

25        The -- for -- my recollection is, you can pretty readily see

1    the wall there.  There are three smaller tanks toward the left of

2    the photograph.  The middle one is the tank at issue, which is

3    Tank 396.  There is a red structure in front of a larger tank

4    farther to the left and between that structure and Tank 396, you

5    can see on the hillside or the bank there is the culvert we've

6    talked about and the eroded area beneath it.  Then, you really

7    can't see very well in that picture the other area where the

8    discharge may have occurred but, as I recall, it's somewhere

9    between the red structure and the space -- the area of the space

10   between those two larger tanks; is that correct?

11            MR. WRIGHT:  That's correct, Your Honor, and the second

12   -- what we would call the second or northern most point source is

13   within that area on the river enclosed by the boom, the white

14   boom.

15            THE COURT:  Right.  It's down there on the surface of

16   the water in the picture.

17            MR. WRIGHT:  Yes, Your Honor.

18            THE COURT:  Right.  Okay.

19      I think that covers everything that we pointed out on that

20   photograph.  Does anybody else have anything to add on that?  I

21   just wanted to make sure the record is clear for posterity.

22      All right.  If there's nothing else, thank you all for

23   coming today and we --

24            MR. LEIGHT:  Your Honor --

25            THE COURT:  Yes?

1           MR. LEIGHT:  Robert Leight on behalf of Freedom.  You

2     had mentioned earlier in this hearing that you were concerned or

3     unsure about what to do with Freedom at the sentencing hearing.

4     Could you clarify that for me, please?

5           THE COURT:  Yeah.  It's kind of -- it's a common sense

6     inquiry.  I can't put Freedom in prison.  I mean, you don't put

7     corporations in prison, and it's pretty hard to put them on

8     probation.  And so, typically, you would expect a fine to be the

9     penalty, but we're in a situation where the claims against the

10    assets of the company exceed the assets of the company.

11       So, my thinking is, okay, if I fine Freedom, I'm taking

12    money out of the hands of people that have made claims as a

13    result of this spill.  So, what exactly am I going to do to

14    Freedom in the way of a sentence?  A special assessment.  Other

15    than that, what am I going to do with Freedom at sentencing?

16       I've been wondering that from day one because I was aware of

17    the multitude of claims and that it was -- you know, I think,

18    when we took the pleas, the bankruptcy was already underway, well

19    underway, and so I've been wondering what would happen at a

20    Freedom sentencing hearing.  That's it.  I suppose we'll address

21    it more at the hearing next Thursday.

22          MR. LEIGHT:  Thank you.  Yes, sir.

23          THE COURT:  I haven't read that Presentence Report, so

24    maybe I'll have something more in that report.

25       Anything else?  All right.  Thank you.

1          (Proceedings concluded at 11:58 a.m., January 27, 2016.)

2

3    CERTIFICATION:

4          I, Ayme A. Cochran, Official Court Reporter, certify that

5    the foregoing is a correct transcript from the record of

6    proceedings in the matter of United States of America, Plaintiff

7    v. Dennis Farrell, William Tis, Charles Herzing, Gary Southern,

8    Freedom Industries, Inc., Michael Burdette and Robert Reynolds,

9    Defendants, Criminal Action Nos. 2:14-cr-00264, 2:14-cr-00275,

10   2:14-cr-00276 and 2:14-cr-00277, as reported on January 27, 2016.

11

12   s/Ayme A. Cochran, RMR, CRR                    January 29, 2016

13   Ayme A. Cochran, RMR, CRR                      DATE

14

15

16

17

18

19

20

21

22

23

24

25